**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

<u>Construction Materials Recycling</u>
<u>Association Issues and Education</u>
<u>Fund, Inc., and New England</u>
<u>Recycling, Inc.</u>

         **v.**                           Case No. 08-cv-376-PB
                                  Opinion No. 2010 DNH 035

<u>Thomas Burack, Commissioner, New</u>
<u>Hampshire Department of Environmental</u>
<u>Services, et al.</u>


<u>**MEMORANDUM AND ORDER**</u>

The issue presented by this case is whether three recently-
enacted statutes that address the burning of construction and
demolition ("C & D") debris violate the Commerce Clause either by
improperly discriminating against out-of-state C & D debris
producers or by excessively burdening interstate commerce.


**I.   BACKGROUND**

In 2007, the New Hampshire legislature passed three bills
that address the use and disposal of C & D debris.  See <u>Constr.</u>
<u>Materials Recycling Ass'n Issues & Educ. Fund v. Burack</u>, 2009 DNH

11, 3.  House Bill 427, codified at New Hampshire Revised

Statutes Annotated ("RSA") § 149-M:4, IV-a, re-defined C & D

debris as

> non-putrescible waste building materials and rubble
> which is solid waste resulting from the construction,
> remodeling,   repair or demolition of structures or
> roads.  The term includes, but is not limited to,
> bricks, concrete and other masonry materials, wood,
> wall coverings, plaster, dry wall, plumbing, fixtures,
> non-asbestos insulation or roofing shingles, asphaltic
> pavement, glass, plastics that are not sealed in a
> manner that conceals other wastes, and electrical
> wiring and components, incidental to any of the above
> and containing no hazardous liquid or metals.  The term
> does not include asbestos waste, garbage, corrugated
> container board, electrical fixtures containing
> hazardous liquids such as fluorescent light ballasts or
> transformers, furniture, appliances, tires, drums and
> containers, and fuel tanks.

N.H. Rev. Stat. Ann. § 149-M:4, IV-a (2009); (see Compl., Doc.

No. 1, ¶ 22.)  House Bill 428, the companion to House Bill 427,

banned the combustion of "the wood component of construction and

demolition debris . . . or any mixture or derivation from said

component"[1] but provided an exception for the "incidental

combustion" of such materials by "municipal waste combustor[s]"

and "municipal incinerator[s]" that were in operation on January

---

[1] When I refer to the burning of C & D debris in this
Memorandum and Order, I mean the burning of the wood component of
C & D debris or any mixture or derivation from said component.

1, 2006.  See N.H. Rev. Stat. Ann. § 125-C:10-c (2009); (Compl.,
Doc. No. 1, ¶ 23).  House Bill 873-FN-LOCAL, codified at RSA 362-
F:2, II, excluded C & D debris from the definition of "biomass
fuels" that qualify as "renewable energy source[s]," and may be
used in New Hampshire to produce electricity.  See N.H. Rev.
Stat. Ann. § 362-F:2, II (2009); N.H. Rev. Stat. Ann. § 362-F:2,
XV (2009); (see also Compl., Doc. No. 1, ¶ 24).  Taken together,
these statutes prohibit wood derived from C & D debris from being
burned within the state except for "incidental combustion" at
municipal combustors and municipal incinerators that were in
existence as of January 1, 2006.

Construction Materials Recycling Association and Education
Fund ("CMRAIE"), a national organization that represents
individuals and companies involved in the reuse of C & D
materials, and New England Recycling, Inc. ("NER"), a
Massachusetts corporation that sells C & D-derived fuel, allege
in this action against Thomas Burack, Commissioner of the New
Hampshire Department of Environmental Services, and Michael
Delaney, the New Hampshire Attorney General (collectively "the
State") that all three statutes--RSA 149-M:4, IV-a, RSA 362-F:2,
II, and RSA 125-C:10-c (collectively "C & D legislation")--

-3-

violate the Commerce Clause.[2]  (<u>See</u> Compl., Doc. No. 1, ¶¶ 6-7;

Pl.'s Opp. to Def.'s Mot. for Summ. J., Doc. No. 16, at 15, 22.)

Plaintiffs base their claim on two legal theories.  First, they

assert that the C & D legislation violates the Commerce Clause

because it improperly discriminates against out-of-state

producers of C & D debris who wish to sell the wood component of

the debris in the local biomass fuel market.  They also contend

that the legislation is unconstitutional even if it is not

discriminatory because it imposes an excessive burden on

interstate commerce.  The State argues in a motion for summary

judgment that plaintiffs' claim fails under either theory.

---

[2] Plaintiffs initially sought relief under both the Commerce
Clause and the Privileges and Immunities Clause.  They also
argued that the C & D legislation was preempted by the Solid
Waste Act, the Resource Conversation and Recovery Act, and
various federal regulations.  (<u>See</u> Compl., Doc. No. 1, ¶¶ 47-54.)
Additionally, plaintiffs sought relief for damages that they
incurred as a result of two moratoriums on burning C & D fuels,
enacted while the New Hampshire General Court considered the
permanent measures that have since been codified as the C & D
legislation.  (<u>See</u> <u>id.</u> ¶ 1.)  On November 12, 2008, the State
filed a motion to dismiss the plaintiffs' complaint in its
entirety.  (<u>See</u> Def.'s Mot. to Dismiss, Doc. No. 7.)  On January
27, 2009, the court granted the State's motion to dismiss as to
plaintiffs' claims under the Privileges and Immunities Clause,
their preemption claims, and their claims challenging the expired
moratoriums under the Commerce Clause.  <u>See</u> <u>Burack</u>, 2009 DNH 11.
Plaintiffs' Commerce Clause challenge to the C & D legislation is
thus their sole remaining claim.

## II.  <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment must first identify the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  <u>Ayala-Gerena v. Bristol Myers-Squibb Co.</u>, 95 F.3d 86, 94 (1st Cir. 1996); see <u>Celotex</u>, 477 U.S. at 323.

## III.  <u>ANALYSIS</u>

The Commerce Clause empowers Congress to regulate commerce "among the several states."  U.S. Const. Art. I, § 8, cl. 3.  Although the clause "do[es] not expressly restrain 'the several states' in any way, [the Supreme Court] ha[s] sensed a negative

-5-

implication in the provision since the early days." Dep't of Revenue v. Davis, 128 S. Ct. 1801, 1808 (2008).  This negative implication, referred to as the dormant Commerce Clause, "prevents state and local governments from impeding the free flow of goods from one state to another" and "prohibits protectionist state regulation designed to benefit in-state economic interests by burdening out-of-state competitors." Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 35 (1st Cir. 2005) (internal quotations omitted); see also Davis, 128 S. Ct. at 1808; Cherry Hill Vineyard, LLC v. Baldacci, 505 F.3d 28 (1st Cir. 2007).

Laws that discriminate against out-of-state interests are treated differently under the dormant Commerce Clause from laws that affect interstate commerce even-handedly.  "A discriminatory law is virtually per se invalid . . . and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable non-discriminatory alternatives." Family Winemakers of Calif. v. Jenkins, No. 09-1169, 2010 U.S. App. LEXIS 886, at *19 (1st Cir. 2010) (quoting Davis, 128 S. Ct. at 1808 (internal citations and quotations omitted)).  In contrast, a non-discriminatory law that nevertheless burdens interstate commerce "will be upheld unless the burden imposed on interstate

commerce is clearly excessive in relation to the putative local benefits." Davis, 128 S. Ct. at 1808 (quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).

**A.   Discrimination Claim**

In the context of a dormant Commerce Clause challenge, discrimination "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Family Winemakers, 2010 U.S. App. LEXIS 886, at *18 (quoting Or. Waste Sys. v. Dep't of Envtl. Quality, 511 U.S. 93, 99 (1994)). Even a facially neutral law will be considered discriminatory if it is discriminatory in either its purpose or its effect. Cherry Hill, 505 F.3d at 33. As the First Circuit has recognized, however, "[i]ncidental purpose, like incidental effect, cannot suffice to trigger strict scrutiny under the dormant Commerce Clause." Alliance of Auto. Mfrs., 430 F.3d at 39.

Plaintiffs acknowledge that the C & D legislation is facially neutral because it treats C & D debris generated within New Hampshire and imported from out of state identically. (Pl.'s Opp. to Def.'s Mot. for Summ. J., Doc. No. 16, at 14 n.4.) Nevertheless, they argue that the legislation's hidden purpose is protectionist. As plaintiffs see it, the legislation was enacted

-7-

to benefit New Hampshire's virgin wood producers in the local market for biomass fuel at the expense of out-of-state providers of C & D debris who wish to compete with virgin wood producers. Plaintiffs also argue that the C & D legislation has a discriminatory effect even if it was not intended to discriminate against out-of-state interests because it entirely forecloses out-of-state C & D debris sellers from competing in the New Hampshire biomass fuel market.  I address each argument in turn.

      1.  **Discriminatory Purpose**

Plaintiffs concede that the C & D legislation appears to be aimed at the protection of the public health and the environment rather than the promotion of local commerce.  (Pl.'s Opp. to Def.'s Mot. for Summ. J., Doc. No. 16, at 14 n.4.)  Although none of the three statutes that comprise the legislation include an express statement of purpose, each amends chapters of the New Hampshire Revised Statutes Annotated that are primarily concerned with public health and environmental protection.  The stated purpose of Chapter 125-C, which effectuates the C & D debris combustion ban, is "to achieve and maintain a reasonable degree of purity of air resources of the state so as to promote the public health, welfare, and safety."  N.H. Rev. Stat. Ann. § 125-C:1 (2009).  Similarly, Chapter 149-M, which codifies the current

definition of C & D debris, was enacted "so as to protect public health, to preserve the natural environment, and to conserve precious and dwindling natural resources through the proper and integrated management of solid waste."  N.H. Rev. Stat. Ann. § 149-M:1 (2009).  Finally, Chapter 362-F, which excludes C & D debris from the definition of biomass fuels, makes clear that its goal is to promote "local renewable fuels" that can "improv[e] air quality and public health, and mitigat[e] against the risks of climate change."  N.H. Rev. Stat. Ann. § 362-F:1 (2009).

The structure and effect of the C & D legislation also supports the State's contention that it was intended principally to benefit the public health and the environment rather than to regulate commerce.  If, as plaintiffs argue, the legislation was enacted to protect local commercial interests in the biomass fuel market, one would expect the legislation to be targeted at this market exclusively.  The legislation sweeps more broadly, however, and bans the combustion of C & D debris whether it is burned as a fuel or merely to effect disposal.[3]  Thus, the scope of the legislation better fits the State's contention that it was

_____

[3]  The legislation allows C & D debris to be burned in municipal facilities but it authorizes only "incidental combustion" by municipal combustors and incinerators that were in existence as of January 1, 2006.  § 125-C:10-c.

aimed primarily at public health and environmental protection
rather than the promotion of local commercial interests.
Evidence of this sort, which focuses on the text of the statute
itself, often provides a strong signal of legislative purpose.
See, e.g., Family Winemakers, 2010 U.S. App. LEXIS 886, at *32
(court should consider whether the statute was "'closely tailored
to achieve the legislative purpose' the state asserted")(quoting
Alliance of Auto. Mfrs., 430 F.3d at 38)).

Plaintiffs nevertheless cite legislative history to support
their argument that the C & D legislation's true purpose was to
protect New Hampshire's virgin wood producers in the local
biomass fuel market.  Most prominently, plaintiffs rely on
Burack's testimony to the Senate Committee on Energy,
Environment, and Economic Development, in which he advocated for
the adoption of HB 427 and HB 428 by stating, among other things,
"I should also point out that as a department and state, it's
critically important, we believe, that we promote a more
economically viable and vibrant logging and forest products
industry here in our state."  (Pl.'s Opp. to Def.'s Mot. for
Summ. J. Ex. A, Doc. No. 16-2, at 10-11.)  Plaintiffs claim that
this statement, which was echoed by other supporters of the
legislation, establishes that the legislation's true purpose was

-10-

protectionist.  <u>See, e.g.</u>, N.H.H.R. Jour. 310 (2007); Senate
Comm. on Energy, Env't and Econ. Dev., Public Hearing on HB 427
and HB 428, at 20 (statement of Sen. Larsen), 38 (statement of
Mr. McLaughlin), 49 (statement of Rep. Phinizy) (Apr. 24, 2007);
House Comm. on Science, Tech. and Energy, Public Hearing on HB
428, at 1 (statement of Rep. Hamm), 2 (statement of Rep. Phinizy)
(Feb. 7, 2007).

        Although the statements plaintiffs cite suggest that many of
the C&D legislation's supporters believed that it would benefit
the state's virgin wood producers, the legislative history as a
whole establishes that the promotion of local business interests
was at most an incidental justification for the legislation.
Plaintiffs acknowledge that the impetus for the C & D legislation
was a permit that a Hopkinton, New Hampshire power plant obtained
in 2003 to burn C & D debris as a fuel source. (Compl., Doc. No.
1, ¶ 9.)  Plaintiffs assert that after the permit was obtained,
"opponents of the Hopkinton plant began to more strenuously
contend that New Hampshire could become the 'dumping ground' for
construction and demolition debris from throughout the Northeast,
and contended that burning of C and D fuel was unhealthy due to
toxic air emissions, and that allowing New Hampshire to become a
'dumping ground' would exacerbate a public health problem."

(Compl., Doc. No. 1, ¶ 15.)

Bills were later introduced in both the House and the Senate that called for the creation of a joint legislative committee to study various issues associated with the disposal of C & D debris.  See N.H.H.R. Bills, HB 517 (2005); N.H.S. Bills, SB 215 (2005).  The House bill also proposed a moratorium on the burning of C & D debris within the state.  See HB 517.  Both bills were ultimately adopted, along with a third bill filed the following year to extend the moratorium.  See 2005 N.H. Laws 169; 2005 N.H. Laws 215; 2006 N.H. Laws 186.  Significantly, the legislative histories of these laws include many references to the adverse public health and environmental effects of burning C & D debris, but they make no mention of the commercial benefits that a ban on the burning of C & D debris might produce for local virgin wood producers.[4]  See, e.g., House Comm. on Env't and Agric., Public

_____

[4] Plaintiffs point to the joint study committee's final report to support their contention that the "underlying ultimate objective" of any proposed burning ban was to prevent the importation of C & D debris from out of state. (Pl.'s Opp. to Def.'s Mot. for Summ. J., Doc. No. 16, at 9.)  In particular, they cite the following excerpt from the report's executive summary:

should New Hampshire approve a policy of incineration of C & D wood within this state, it would not be able to ban importation according to the Interstate Commerce Clause.  Since the cost to ship C & D wood chips is a

Hearing on HB 517, at 1 (statement of Rep. Phinizy), 2 (statement
of Dr. Bassi) (Feb. 17, 2007); Senate Comm. on Energy and Econ.
Dev., Hearing on H.B. 517, at 3 (statement of Rep. Hamm), 10
(statement of Rep. Butynski), 20 (statement of Dr. Bassi), 34
(statement of Ms. Irwin) (May 17, 2005); Comm. to Study Certain
Issues Relative to Constr. and Demolition Waste, Final Report on
HB 517, Chapter 205, Laws of 2005, at 1 (July 1, 2006)
("Safeguarding our public health and our environment should
remain at the forefront when deciding on a C & D management
policy for New Hampshire.").

        The legislative history of the C & D legislation itself

_____

        major factor in the economics of C & D disposal and
        processing, it is likely that an undeterminable amount
        of C & D wood could be imported into New Hampshire,
        rather than Maine, for incineration.

(Id.)  I am unpersuaded by this argument.  As the report itself
makes clear, the excerpt plaintiffs cite merely reflects advice
that the Committee received from the Attorney General that the
state could not selectively ban the importation of C & D debris.
See Comm. to Study Certain Issues Relative to Constr. and
Demolition Waste, Final Report on HB 517, Chapter 205, Laws of
2005, at 10 (July 1, 2006).  The C & D legislation addresses this
concern by barring C & D debris from being burned, whether or not
it is imported from outside the state.  While I do not doubt that
many supporters of the C & D legislation opposed the importation
of C & D debris, their larger concern was with the adverse public
health and environmental effects of burning C & D debris,
regardless of its source.  Thus, the excerpt that plaintiffs cite
is not evidence of discriminatory purpose.

underscores the fact that it was intended primarily to promote the public health and the environment rather than to benefit local commercial interests.  Although supporters touted the beneficial effect that the legislation would have on the state's virgin timber producers, their statements as a whole demonstrate that their principal concern was with what they believed were the adverse public health and environmental effects of burning C & D debris.  <u>See, e.g.</u>, Senate Comm. on Energy, Env't and Econ. Dev., Public Hearing on HB 427 and HB 428, at 14-16 (statement of Gov. Lynch), 17 (statement of Rep. Hamm), 19 (statement of Sen. Larsen), 25-26 (statement of Ms. Ward, REACH for Tomorrow), 27 (statement of Dr. Bassi), 28 (statement of Mr. Jones), 31 (statement of Dr. Treadwell), 33 (statement of Mr. Flood, REACH for Tomorrow), 36 (statement of Ms. Staaf, Environment New Hampshire) (Apr. 24, 2007); House Comm. on Science, Tech. and Energy, Public Hearing on HB 428, at 1 (statement of Rep. Hamm, statement of Gov. Lynch), 2 (statement of Sen. Sgambati, statement of Sen. Clark, statement of Mr. Babson, statement of Ms. Lawrence, Science Notes) (Feb. 7, 2007).

    In summary, the language, structure, and legislative history of the C & D legislation demonstrate that the legislation's principal purpose was to promote the public health and the

environment.  While the legislation's supporters may also have
believed that it would benefit local virgin wood producers, this
was at most an incidental purpose that does not justify the
heightened scrutiny that must be given to discriminatory
legislation under the dormant Commerce Clause.[5]  See Alliance of
Auto. Mfrs., 430 F.3d at 39 (recognizing that incidental
discriminatory purpose does not warrant strict scrutiny under the
dormant Commerce Clause).

> ### 2.   Discriminatory Effect

Although "the Supreme Court has not directly spoken to the
question of what showing is required to prove discriminatory

---

[5]  Plaintiffs argue that their discriminatory purpose claim
cannot be resolved through a motion for summary judgment because
the record includes evidence that supporters of the legislation
believed that it would benefit local virgin timber producers at
the expense of out-of-state C & D debris suppliers.  As
plaintiffs see it, this makes legislative purpose a disputed
issue of fact that cannot be resolved through a motion for
summary judgment.  I disagree.  First, it is by no means clear
that the determination of legislative purpose is a factual
inquiry.  See, e.g., Caleb Nelson, Judicial Review of Legislative
Purpose, 83 NYU L. Rev. 1784, 1859 n.306 (2008) ("[A]mong other
things, federal circuit courts may disagree about whether to
review conclusions about legislative motivation as questions of
law or as questions of fact.").  In any event, when I construe
the evidence bearing on the issue in the light most favorable to
the plaintiffs it, at most, suggests that the protection of local
timber producers was an incidental purpose of the legislation.
Thus, the evidence plaintiffs cite does not give rise to a
genuine issue of material fact that precludes summary judgment.

effect where . . . a statute is evenhanded on its face and wholesome in its purpose," the First Circuit has held that this showing must be "substantial."  Cherry Hill, 505 F.3d at 36.  A plaintiff, therefore, must "submit some probative evidence of adverse impact . . . the mere fact that a statutory regime has a discriminatory potential is not enough to trigger strict scrutiny under the dormant commerce clause."  Id. at 36-37; see also Alliance of Auto. Mfrs., 430 F.3d at 41.  This burden cannot be met merely by showing that a statute favors one product over another.  As I have noted, discrimination claims under the dormant Commerce Clause target "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  Family Winemakers, 2010 U.S. App. LEXIS 886, at *18.  Thus, while the adversely affected products need not be entirely out of state and, conversely, the favored products need not be entirely in state, a statute ordinarily must predominately benefit in-state products at the expense of out-of-state products to support a discrimination claim based solely on the statute's unintended discriminatory effect.[6]

---

[6] Discerning whether an actual, adverse discriminatory effect exists also "assumes a comparison of substantially similar

-16-

Plaintiffs argue that they have a viable discriminatory effect claim because C & D debris and virgin wood products compete in the local biomass fuel market and "the overwhelming majority of C & D debris producers who would otherwise be able to sell their product to New Hampshire combustors are out-of-state, and the overwhelming majority of wood producers who are selling to New Hampshire combustors are in-state . . ." (Pl.'s Opp. to Def.'s Mot. for Summ. J., Doc. No. 16, at 22.)  The difficulty with this argument is that plaintiffs have failed to offer sufficient evidentiary support for the premises on which it is based.

Although plaintiffs claim that the majority of C & D debris comes from out-of-state sources, the only evidence in the record on this issue suggests that the volume of C & D debris produced

---

entities."  Davis, 128 S. Ct. at 1811 (finding that Kentucky, as a public entity, was not "substantially similar" to private bond issuers in the market).  When, as in the present case, "the allegedly competing entities provide different products . . . there is a threshold question whether the companies are indeed similarly situated for constitutional purposes."  GMC v. Tracy, 519 U.S. 278, 298–99 (1997).  To be considered similarly situated, the supposedly favored and disfavored entities must produce similar products that compete within a single market. See id. at 300.  Although plaintiffs have produced scant evidence on this point, I assume for purposes of analysis that the wood component of C & D debris and virgin wood are competing products in the local biomass fuel market.

in New Hampshire when the legislation was adopted substantially
exceeded the volume of C & D debris that was then being imported
from surrounding states.  (See Def.'s Reply to Pl.'s Opp. Ex. 2,
Doc. No. 19-3, at 2.)  This calls into question the need for
judicial intervention to protect C & D debris producers because,
as the Supreme Court has observed, "[t]he existence of major in-
state interests adversely affected by [a regulation] is a
powerful safeguard against legislative abuse." Minnesota v.
Clover Leaf Creamery, 449 U.S. 456, 473 n.17 (1981).

     Equally problematic is the absence of any evidence in the
record to support plaintiffs' contention that most virgin wood
that is sold in the state's biomass fuel market comes from local
sources.  While it is undeniable that New Hampshire has a
substantial virgin wood products industry, it is equally true
that surrounding states are also vibrant producers of virgin
wood.  Without evidence, I am left to speculate as to the extent
to which the C & D legislation disproportionately benefits local
virgin wood producers.

     In summary, a reasonable fact-finder could not conclude on
the present record that the C & D legislation has a substantial
discriminatory effect because plaintiffs' argument on this point
is based upon the unsupported assertions that most C & D debris

that is affected by the legislation comes from out of state and most virgin wood that has replaced C & D debris as a fuel source comes from in state.

**B.   Excessive Burden Claim**

Having concluded that the C & D legislation is not discriminatory, I must next determine whether it "burdens commerce in a way that is clearly excessive in relation to the putative local benefits to be derived therefrom." Cherry Hill, 505 F.3d at 33 (citing Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).  Under the Pike balancing test, "laws that regulate evenhandedly and only incidentally burden commerce are subjected to less searching scrutiny," and are therefore upheld unless the burdens that they impose upon commerce "clearly outweigh" their state or local benefits.  Id.; Davis, 128 S. Ct. at 1817.  "If a legitimate local purpose is found, then the question becomes one of degree . . . the extent of the burden that will be tolerated will [ ] depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." Pike, 397 U.S. at 142.

The balancing of benefits and burdens required by Pike is accomplished in three steps.  "First, we are to evaluate the nature of the putative local benefits advanced by the statute.

-19-

Second, we must examine the burden the statute places on interstate commerce.  Finally, we are to consider whether the burden is 'clearly excessive' as compared to the putative local benefits."  Pharm. Care Mgmt. Ass'n v. Rowe, 429 F.3d 294, 312 (1st Cir. 2005).  Courts must be careful not to second-guess reasonable legislative judgments when evaluating the local benefits of challenged legislation.  Emphasizing that Pike mandates an inquiry only into the "putative" benefits of the challenged legislation, the First Circuit has observed in this regard that "it matters not whether these benefits actually come into being at the end of the day."  Id. at 313.

## 1.  **Putative Benefits**

As I have explained, the C & D legislation was enacted principally to promote the public health and the environment.  These are plainly legitimate subjects of state regulation and plaintiffs do not argue otherwise.  Instead, they contend that the putative public health and environmental benefits of the burning ban should be given little weight because they will prove to be illusory in practice.

As a preliminary matter, I note that First Circuit precedent forecloses plaintiffs' argument because it directs a court to consider only the "putative" benefits of the challenged

-20-

legislation rather than its effectiveness in practice.  See Rowe, 429 F.3d at 313.  More importantly, I am unpersuaded by plaintiffs' argument even when I assume for purposes of analysis that I am free to undertake my own inquiry into the effectiveness of the C & D legislation.  The legislative committees that considered the C & D legislation received testimony from several medical health professionals concerning the harmful health effects that result from the burning of C & D debris, and both legislators and DES representatives identified numerous environmental problems associated with the burning of C & D debris.  (See Def.'s Reply to Pl.'s Opp., Doc. No. 19, at 10-14; Def's Reply to Pl.'s Opp. Ex. 1, Doc. No. 19-2; Pl.'s Opp. to Def.'s Mot. for Summ. J. Ex. A, Doc. No. 16-2, at 7, 14, 17-18, 20.)  Although plaintiffs allege in a conclusory fashion that "there is no evidence, nor reason to believe, that burning C & D wood is more harmful to the environment than burning virgin wood," (Pl.'s Opp. to Def.'s Mot. for Summ. J., Doc. No. 16, at 23), they have produced no evidence to support this contention.  When parties bear the burden of proof on an issue, as plaintiffs do here, they must do more than complain about the poor quality of the opponent's evidence.  Because plaintiffs have failed to offer any proof to support their allegation that the C & D

legislation is ineffective as a public health and environmental protection measure, I cannot credit their argument on this point, even if I were to accept their contention that <u>Pike</u> authorizes this type of inquiry.

### 2. <u>Burden on Interstate Commerce</u>

Plaintiffs argue that the C & D legislation burdens interstate commerce by denying out-of-state producers of C & D debris access to the New Hampshire market.  According to plaintiffs, the legislation harms commerce by reducing overall demand for C & D-derived fuel and subjecting C & D debris producers to higher costs by forcing them to ship their fuel to more remote facilities in Maine.  Although plaintiffs have made no attempt to quantify these effects, I will assume for purposes of analysis that the legislation will burden interstate commerce in the manner that plaintiffs claim.

### 3. <u>Balancing Burdens and Benefits</u>

The balancing of burdens and benefits required by <u>Pike</u> does not result in a close call in this case.  Construing the evidence in the light most favorable to the plaintiffs, the record at best suggests that an unknown number of regional producers of C & D-derived fuel will suffer unquantified reductions in profits if they are denied access to the New Hampshire biomass fuel market.

-22-

A dormant Commerce Clause claim, however, cannot be based merely on a showing that a challenged statute will cause individual out-of-state businesses to lose profits.  <u>Rowe</u>, 429 F.3d at 313. This is especially true in cases such as the present one, where the legislation at issue is reasonably targeted at important public health and environmental concerns.

Plaintiffs also claim that the balance of burdens and benefits required by <u>Pike</u> should shift in their favor because the State could address all legitimate public health and environmental concerns without burdening interstate commerce by requiring that fuel derived from C & D debris be burned only in facilities that employ Best Available Control Technology[7] ("BACT").  While I recognize that the availability of equally

---

[7] "Best Available Control Technology" is defined in New Hampshire law as

an emission limitation based on the maximum degree of reduction for each air contamination that would be emitted from any device that the department, on a case-by-case basis, taking into account energy, environment, public health, and economic impacts and other costs, determines is achievable for such device through application of production processes or available equipment, methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such air contaminant.

N.H. Rev. Stat. Ann. § 125-C:10-b (2009).

effective but less restrictive alternatives is a relevant
consideration under Pike, the plaintiffs have failed to offer
evidence that supports their claim.  Plaintiffs have not
identified the specific BACT limitation that would address air
quality issues that may arise from the burning of fuel derived
from C & D debris, nor have they demonstrated that technology
exists that could achieve that limitation.  Furthermore,
plaintiffs do not explain how the implementation of BACT would
address other environmental issues that were raised during debate
on the C & D legislation, such as problems posed by the need to
dispose of the toxic ash that allegedly results from the burning
of C & D-derived fuel.  Without such evidence, I simply cannot
conclude on the present record that the use of BACT would be an
effective substitute for a complete ban on the burning of C & D
debris.

### IV.  CONCLUSION

Plaintiffs have failed to present a triable case either that
the C & D legislation is discriminatory or that it excessively
burdens interstate commerce.  Accordingly, the State's motion for
summary judgment (Doc. No. 15) is granted.  The clerk is
instructed to enter judgment and close the case.

SO ORDERED.

/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

February 25, 2010

cc:  Frank P. Spinella, Jr., Esq.
     Leon A. Blais, Esq.
     Mary E. Maloney, Esq.